United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLEY LYTTLE,<br><br>               Plaintiff,<br><br>      v.<br><br>UNITED OF OMAHA LIFE INSURANCE<br>COMPANY,<br><br>               Defendant. | Case No.  17-cv-01361-WHO<br><br>**ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 32, 33 |

This case arises out of defendant United of Omaha Life Insurance Company's (United) denial of decedent Matthew Lyttle's (Lyttle) claim for long-term disability (LTD) benefits. Plaintiff Shelley Lyttle, Matthew's spouse, argues that she is entitled to LTD benefits from the time Lyttle left work and until his death plus three months of ancillary life insurance benefits.

The central questions are whether United applied the correct standard in finding that Lyttle did not suffer a "change of circumstance" in his medical conditions from when he was working to when he went out on disability, or whether United was required to determine whether Lyttle could perform his occupation "with reasonable continuity" and if it applied the latter standard whether Lyttle would have been entitled to LTD benefits. Plaintiff also argues that because United failed to provide a full and fair review of the LTD claim, she should be able to offer evidence to supplement the Administrative Record (AR) that confirms that Lyttle was entitled to LTD benefits.

I conclude that United failed to apply the correct standard in its determination and, based on the information in the record at the time of United's determination, there was significant evidence that Lyttle was not able to continue in his job with reasonable continuity. In reaching this decision, I do not rely on the additional evidence submitted by plaintiff that is outside the

administrative record.  However, if I were to consider that evidence, it would only strengthen my determination that Lyttle was not able to continue in his job with reasonable continuity.

## BACKGROUND

### I.   WORK AND TIME OFF

Until he stopped working on December 30, 2015, Lyttle was employed by Biosearch Technologies, Inc. as a Vice-President of Chemistry.  AR 1055.  His Job Description was:

> The VP is the ultimate authority on Chemistry in the Company.  This position involves lateral authority throughout the company to define technology and execute chemical projects consistent with Corporate objectives. Leadership in the development of innovative products and processes is required, with an eye towards profitability, product quality and performance as well as employee safety in general operations.
>
> At Biosearch, this position requires a thorough working knowledge of Oligonucleotide chemistry particularly as applied to solid phase supported synthesis, nucleoside chemistry, and the manufacture of dyes and quenchers. The VP of Chemistry will assist as necessary, the Director of R and D to develop new product programs.

AR 1055. Qualifications were a Ph.D. in chemistry, over 15 years experience in the biotechnology industry, good communication skills, and computer literacy.  *Id*.  In addition, the Job Description provided:

> **Hazards**: Employees in this role may be called upon to work with Hazardous Materials and/or Hazardous Waste.

*Id*.

The Employer Statement, provided by Biosearch to United and signed by Joanne Giffra (the Payroll & HR Admin. Manager), indicated that Lyttle regularly worked 8 hours per day/40 hours per week. AR 1016.  His job "continuously (67%-100%)" required reasoning, math and language and to make independent judgments.  He had to work with hazardous and organic chemicals and waste, he had to "frequently (34%-66%)" stand and lift/carry 25 lbs, and "occasionally (0%-33%)" walk, sit, stoop, kneel, reach/work overhead.  AR 1017-18.  Giffra noted that Lyttle's job could not be modified to accommodate his disability.  AR 1018.

Lyttle continued to work until December 30, 2015.  Lyttle's payroll records showed that in 2015 he used 320 hours of vacation time, AR 925, including taking the entire month of October

2015 off work. AR 937-938. For the December 16-31, 2015 pay period Lyttle also used 24 hours of sick leave. AR 931. The prior year, in 2014, Lyttle used 136 vacation hours and 48 hours of sick leave. AR 926.

On April 6, 2016, United asked Lyttle's former employer if one aspect of his former position – carrying chemicals/waste of up to 25 lbs – could be accommodated by having someone else perform that role or providing a cart, and questioned how long Lyttle's position would be held open for him. AR 297. In response, Lyttle's employer responded that the "problem with his feet was a symptom of the larger medical issue (cancer) that he is dealing with and that prevents him from working so we do not believe accommodation is an option." AR 296. His employer also explained that it would not replace his position "as he was one of the original employees of the company and has unique skills that cannot be replaced." AR 299.

## II. DIAGNOSES, MEDICAL, AND SUBJECTIVE EVIDENCE IN THE ADMINISTRATIVE RECORD

Lyttle was diagnosed with liver cancer in September 2011. The cancer was confirmed to have spread outside his liver in 2014.

On November 11, 2015, Lyttle was seen by Dr. Jerome G. Kim, who provided the following history:

> CC: metastatic hepatocellular carcinoma
>
> HPI
> Matthew Lyttle is a 62 YO male with multiple comorbidities, including Hepatitis C, hepatocellular carcinoma, atrial fibrillation, history of aortic valve replacement and on coumadin. He was diagnosed with hepatocellular carcinoma by liver biopsy 9/8/2011. His HCC has been managed closely by interventional radiology and gastroenterology. He is noted to have had multiple chemoembolization procedures using doxorubicin starting from 10/27/11, and most recently receiving his ultimate TACE on 8/18/14, with documentation stating that he has reached his lifetime maximum anthracycline limit.
>
> The patient was noted to have developed a chest wall mass, and on 8/18/14, he underwent Biopsy and Cryoablation of the chest wall mass, with pathology unfortunately showing carcinoma consistent with a hepatic primary.
>
> Patient started Sorafenib 9/2014, but noted severe grade 3 hand foot syndrome noted about 3 weeks after starting, leading to discontinuation of sorafenib until resolution of his hand foot

3

syndrome.

Pt's last dose of coumadin was 10/23/14. Switched over to lovenox.

Restarted Sorafenib 200mg po bid on 10/31/14, but with return of hand foot syndrome, requiring hold.

Pt restarted sorafenib 200mg po daily on 11/24/14.
Attempted to titrate sorafenib dose to highest tolerated dose, but best tolerated dose is sorafenib 200mg po daily.

Subjective: Pt with overall good tolerance of sorafenib. Mild skin lesion at bottom of foot, but no open lesion and pt able to do activities with no significant problems. No fevers, chills, nausea, vomiting, diarrhea.
Uses occasional norco.

AR 359. United contends that despite Lyttle having severe flare ups of hand-foot syndrome attributed to his on and off use of Sorafenib in 2014, there is no evidence that he missed any time from work during 2014 because of that condition. Lyttle did, however, use 136 vacation hours and 48 hours of sick leave in 2014.

In November 2015, Dr. Kim's treatment notes show that Lyttle had "overall good tolerance of sorafenib" with mild skin lesions but no open lesions, he was "able to do activities with no significant problems." Dr. Kim prescribed Norco, one tablet every six hours when needed for pain. AR 666. Dr. Kim characterized Lyttle as having "stability in his labs and symptoms for the past year." AR 669.

In an email dated December 28, 2015, Lyttle told Dr. Kim that he would like to take disability starting in 2016 because his condition had not changed and he had persistent pain in his feet and blisters caused by walking around at work. AR 532. Dr. Kim completed a work status report and placed Lyttle off work from January 5, 2016 through June 5, 2016. AR 193.

In early February, as part of a conversation with Dr. Kim to determine where Lyttle would receive his Sorafenib treatments, Lyttle stated that over the next few months he and his wife would be travelling to take care of his in-laws who had had strokes, driving to visit Lyttle's father, and supervising a remodel of their house in Sonoma. AR 737-38. United places much emphasis on these as descriptions of Lyttle's "activity," but plaintiff notes these activities were done with her (Lyttle's wife) and do not actually describe what Lyttle was able to do on a day-to-day basis.

In a February 22, 2016 Physician's Statement, Lyttle's treating oncologist identified

4

Lyttle's primary diagnosis as "hand/foot syndrome," the symptoms of which were "pain/blisters;" he noted objective findings as "erythema, small but uncomfortable lesions at hands and feet." AR 1019. He also diagnosed "hepatocellular carcinoma" that contributed to Lyttle's disability for which Sorafenib was prescribed. *Id.* He described Lyttle's restrictions ("SHOULD NOT DO") as "pain in feet from blisters from walking." He described Lyttle's limitations ("CANNOT DO") as "walk for prolonged periods of time." AR 1020. Restrictions also included use of hands or feet repetitively due to "small blisters that are painful especially with repetitive movement. Limited time standing and walking," meaning that he could not perform repetitive or short cycle work or perform at a constant pace. *Id.* Dr. Kim kept Lyttle off work for six months, but noted it was "unlikely he would return to his prior level of functioning because "symptoms from medication ongoing." AR 1021. However, Dr. Kim also noted that, as of February 2016, Lyttle was unlimited in his ability to maintain attention and concentration; understand remember and carry out complex job instructions; and use judgment to make decisions. AR 1020.

United attempted to reach Lyttle by phone four times between March and early May 2016, in order to complete a questionnaire, but was unable to reach him. AR 1029, 1033, 1035, 1038. United's records show that Lyttle answered two of their calls but they were "cut off," and that United was unable to leave messages the third and fourth times because Lyttle's mailbox was full. As a result, Lyttle did not know that United was attempting to get in touch with him. AR 1033. United did not communicate with Lyttle by mail during this time. It did send him an email on April 5, 2018, asking for more information about his daily life activities. AR 302-303.

On April 12, 2016, in a review of Lyttle's medical records, Nurse Barbara Kerr found the following: (i) "Diagnosis Category" "Ill-Defined and unknown causes of morbidity"; (ii) "CH stated that he had blisters on his feet in 2015 but these were not documented in a physician exam;" and (iii) "Conclusion: . . . . Based on the medical documentation presented for review, it is the opinion of this reviewer that there was no evidence of a significant change in his medical or functional status as of his last day worked and there is no identifiable R/L's for this CH." AR 1025-1029. On April 20, 2016, United asked Dr. Kim whether Dr. Kim agreed with their assessment that Lyttle "should be able to sit, stand, and walk for six hours in an eight hour work

1    day." AR 287-288.  Dr. Kim signed United's Summary without comment on May 6, 2016.  AR

2    242-245.

3          In an "Occupational Analysis" dated April 26, 2016, Ann Darrington R. Crane, MSW,

4    opined that the "essential functions of the job as performed with the employer appear to be

5    consistent with the occupation of Chemical Laboratory Director in the national economy: a light

6    duty job, with significant intellectual demands, and frequent walking or standing and use of upper

7    extremities." AR 279-281.

8          As noted above, Dr. Kim first placed Lyttle off work from January 5, 2016 through June 5,

9    2016, AR 193, and again from June 6, 2016 through December 6, 2016. AR 197.  Kim also

10   provided United another clinical summary, AR 230-231, and office notes and laboratory results

11   from May - July 2016. AR 194-231.  As part of those records, Dr. Kim noted on May 6, 2016, that

12   Lyttle "reports significant pain at his feet, especially in day hours.  Pt takes Norco 10/325 mg up

13   to 5X per day which allows some control of pain, but does not allow for ability for rigorous

14   intellectual tasks. +Still still (sic) with persistent blisters at feet which limits his ability to be active

15   and on his feet.  Fatigue is overall stable." AR 220.  The same document noted that during May

16   2016, Lyttle was staying in Madera County, helping to take care of his father in law who had a

17   stroke.  AR 220.

18         On May 20, 2016, Dr. Kim's notes indicate that Lyttle reported continued blisters at the

19   base of his feet and heals leading to severe pain if he stands for more than two hours and that he

20   was taking Norco four to five times a day which allows "for some control of pain, but does not

21   allow for ability for rigorous intellectual tasks."  AR 224.  Dr. Kim's physical exam noted the

22   blisters on Lyttle's feet.  *Id*.  Lyttle's Sorafenib was continued at the same level. AR 225, 227.

23         Dr. Olalekan Oluwole conducted a review of Lyttle's medical records at United's request

24   and issued a report on October 24, 2016.  In performing that review, United did not ask Dr.

25   Oluwole whether Lyttle could perform his own occupation with "reasonable continuity," but

26   instead asked: "10. Does the medical information document any change in his condition when he

27   ceased working on December 31, 2015?" AR 164.

28         Dr. Oluwole concluded that Lyttle could perform "light level of activity which is

apparently consistent with the level that claimant had previously tolerated until 12/30/2015." AR 156.[1] Dr. Oluwole concluded that Lyttle's self-reported dosing of Norco 5 times a day seemed "high" and it was "unresolved if claimant's need for narcotic medications . . . is higher than what was listed" in Dr. Kim's treatment notes from November 2015. *Id*. If claimant was taking Norco 5 times a day, Dr. Oluwole noted that was "probably sufficient to impair certain intellectual functions." *Id*.

In the end, Oluwole agreed with Crane's "occupational analysis dated 4/26/15." He noted that "Dr. Kim indicated that [Lyttle] is unlikely to return to prior level of functioning," but Oluwole concluded that determination was not based on "objective data" because Kim's physical exam did not list "any changes, no new medication, and no referrals." AR 158. He disagreed with Dr. Kim's disability and limitations analysis by concluding that "Dr. Kim's clinic notes lacked clarity as per documentary evidence for some stated observations and interventions." *Id*. Oluwole noted that Lyttle remained on Sorafenib, but there was "no objective evidence of new or worsening symptoms. The subjective statement that Lyttle required five pills of Norco a day in and of itself does not connote inability to exert." AR 159. Finally, with respect to Lyttle's "subjective statement" that he required 5 Norco 10/325 mg a day to manage his pain, he noted the "subjective side effects from Norco" reported by Lyttle "are not supported by objective data in the records." *Id*. However, Dr. Oluwole acknowledged it remained possible that the lack of objective data may be due to incomplete reporting in Lyttle's chart and gave Lyttle "the benefit of the doubt" in limiting his exertion level to light. AR 159-160.

Lyttle attended a neuropsychological IME, at United's request, performed by David O'Grady, Ph.D. AR 148. In a report dated November 8, 2016, AR 137-151, O'Grady assessed only Lyttle's "current neurocognitive functioning." AR 137. O'Grady noted Lyttle's reports of pain in hands and significant pain in feet. He noted that Lyttle:

> took Norco to help manage the pain. He did not take Norco during the day when he was working because he felt it interfered with his cognitive functioning. He waited until he was ready to leave work,

---

[1] United notes it had wanted a physical IME but because Lyttle was in Idaho for the month of October 2016, it decided to have a review based on records instead. AR 165.

and then took the medication. He also took Norco on the weekends. In 2015, he came to feel that the level of pain was intolerable without Norco.

AR 140.

O'Grady noted Lyttle's subjective reports that at work he noticed difficulties with complex problem solving and that his "[w]ork in the lab was becoming increasingly challenging." AR 141. But Lyttle also reported engaging in a full range of activities, including light housework, home repairs, training and caring for purebred dogs, and running errands, although the pain in his feet required him to spend the afternoon and most of the evening sitting down. AR 139. He also indicated that he handles his own finances, prepares his tax returns, and manages a large investment portfolio without assistance. AR 140.

Based on his testing, O'Grady concluded that Lyttle had generally intact neurocognitive abilities, well within the expected range, with the exception of mild impairment in certain aspects of short-term memory and speed of information processing. AR 143. For example, while Lyttle's working memory was high average (77th percentile), his processing speed was not impaired but slower than expected (16th to 25th percentile). AR 143. Those tests "indicate a mild but clinically significant degree of psychomotor slowing. In comparison to typical people of his age and intellectual ability, he is likely to need significantly more time to process input, think, make decisions, and complete tasks." AR 143-144.

Lyttle's short term memory was variable, and the test results were "extremely poor" and in area of "borderline impaired." AR 144. His delayed recognition accuracy was better, but still below the expected level (16th percentile). *Id.* "Taken together, [Lyttle's] performance on these tests indicate variable abilities in short-term memory. . . . he has a [sic] significant limitations in his ability to learn new information that is complex or not highly organized. In addition to impairment in encoding, he shows relative weakness in retrieval processes, but storage is relatively spared." *Id.*

Lyttle's manual dexterity "with his dominant right hand was awkward and slow, in the Low-Average range (9th percentile). His performance with his left hand was within normal limits (28th percentile). This performance suggests a mild manual dexterity deficit in the right hand,

probably due to the painful blisters on his fingers." AR 145.

O'Grady made the following diagnoses: "DSM-IV Axis I: 1. Cognitive disorder NOS, likely due to medication side effects. . . .DSM-5: 1. Mild neurocognitive disorder likely due to medication side effects (294.10)." AR 145. O'Grady notes that these test results were consistent with Lyttle's self-reported difficulties except that, in O'Grady's exam, tests of problem solving did not reveal any degree of impairment. AR 146. O'Grady concluded that he saw "no evidence of impairments that would indicate restrictions from a neuropsychological perspective. The available evidence does indicate that the claimant has a limitation in his ability to remember complex information and process simple information quickly and accurately. I would note here that the likely cause of his cognitive limitations is the side effects of opioid medication. . . .I would characterize the severity of his cognitive limitations as mild, but probably sufficient to significantly limit his ability to function effectively in a very demanding, high-level cognitive work that involves analysis, generation of solutions to complex problems, and inability to learn and remember complex information. If he cannot learn, retain and retrieve new information, he will probably not be able to reliably perform work-related tasks except those that are already highly familiar and well practiced." AR 147. "In my opinion, the claimant does exhibit significant limitations in his neurocognitive functioning." AR 148. O'Grady also noted that there was no evidence of "incomplete effort, symptom magnification, or malingering." AR 148.

## III.  POLICY AND CLAIM

### A.  Policy

Lyttle's LTD Policy provided:

> **Substantial and Material Acts** means the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified.
>
> In determining what substantial and material acts are necessary to pursue Your Usual Occupation, We will first look at the specific duties required by Your employer. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in Your Usual Occupation. If any specific, material duties required of You by Your employer differ from the material duties customarily required of other employees engaged in

Your Usual Occupation, then We will not consider those duties in determining what substantial and material acts are necessary to pursue Your Usual Occupation.

**Totally Disabled and Total Disability** means that as a result of Injury or Sickness You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation.

After a Monthly Benefit has been paid for 24 months, You are Totally Disabled when as a result of Injury or Sickness You are not able to engage with reasonable continuity in any occupation in which You could reasonably be expected to perform satisfactorily in light of Your age, education, training, experience, station in life, and physical and mental capacity.

. . .

**Usual Occupation** means any employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the Policyholder when Disability began. Usual occupation is not necessarily limited to the specific job You performed for the Policyholder.

AR 52.  The Policy also has an Elimination Period which is the later of:

(a) 90 calendar days; or

(b) if applicable, the date Your Salary Continuation, Accumulated Sick Leave or short-term disability payments under the Policyholder's insured or self-insured group plan end.

For accumulating days of Disability to satisfy the Elimination Period, the following will apply:

(a) a period of Disability will be treated as continuous during the Elimination Period unless Disability stops for more than 90 Trial Work Days during the Elimination Period; and

(b) Trial Work Days will not be used to satisfy the Elimination Period.

AR 25.

The Elimination Period is defined as:

a period of continuous Total or Partial Disability which must be satisfied before You are eligible to receive benefits. No benefit is payable during the elimination period. The elimination period begins on the first day of Disability and can be satisfied if You are working. The elimination period is shown in the Schedule and must be satisfied within the Accumulation Period.

AR 49.  Benefits are payable under the Policy if "while insured under this provision, You become

Disabled due to Injury or Sickness, We will pay the Monthly Benefit shown in the Schedule.

Benefits will begin after You satisfy the Elimination Period shown in the Schedule." AR 34.[2]

2    **B.    Claim and Appeals**

3        Lyttle filed his claim for LTD benefits, which United received on March 3, 2016. AR

4    1011. He claimed that he was unable to work due to pain in his feet, and that his duties required

5    him to perform "synthesis & testing & supervision" and physical requirements to "lift & walk."

6    AR 1013.

7        United denied Lyttle's claim by letter dated May 5, 2016. AR 247-257. The denial letter

8    explained: "our review of the current medical documentation on file has found that you should be

9    able to sit, stand and walk for six hours in an eight-hour work day," AR 251, and "[t]he provided

10   medical information has failed to document any change in your condition when

11   ceased you working (sic)." AR 252.

12       Lyttle appealed on August 24, 2016. In his appeal, Lyttle explained he had another

13   examination by Dr. Kim in June 2016 and that after the exam, Dr. Kim wrote a work status report

14   placing Lyttle off work from June 6, 2016 through December 6, 2016 (following Dr. Kim placing

15   him off work from January 5, 2016 to June 5, 2016). AR 232-233. Lyttle also provided additional

16   and more recent medical records, explaining how his cancer diagnosis led to his use of

17   chemotherapy drugs that caused his painful blisters on his feet. AR 233.

18       He also provided evidence from Dr. Kim that Lyttle could not be on his feet more than 2

19   hours a day, contradicting the 6-8 hours Dr. Kim "mistakenly" agreed with on May 6, 2016 when

20   Dr. Kim signed United's letter without comment. AR 233. Lyttle also noted that Kim was never

21   asked by United about the level of pain Lyttle experienced while working, which Lyttle described

22   as significant and only ameliorated by not working and staying off his feet. AR 234-35. Lyttle

23   also questioned why United's reviewers disagreed with a "Cancer and Internal MD who has

24   determined Lyttle's disability and eligibility for State Disability Insurance." *Id*. 234. Finally,

25   Lyttle disagreed with United's position that he must have suffered a "change in conditions"

26   immediately before ceasing working, arguing that was not a requirement under his Policy and

27

28   [2] United asserts and plaintiff does not dispute that the Elimination Period here runs from
     December 31, 2015 through March 30, 2016. United Mot. at 11-12.

explaining that if the situation with his feet was not getting worse "it is probably due to being able to stay off my feet for the many hours I would be on them working," presumably in light of the extensive time he took off work in 2015 and ceasing work in December 2015. AR 235.

As noted above, the Oluwole Report and O'Grady Report were submitted to United on October 24, 2016 and November 8, 2016. Those Reports were not shared with Lyttle before United made a decision on his appeal. By letter dated December 21, 2016, United denied Lyttle's appeal. In its appeal, United concluded that the "records did not support a change in your condition(s) as of your claimed disability date and forward on a continuous basis." AR 132.

## IV. ADDITIONAL EVIDENCE

Plaintiff argues that United did not allow for a "full and fair" hearing on Lyttle's claim because it did not share the O'Grady and Oluwole Reports with Lyttle before reaching its decision on the appeal and, therefore, prevented him from addressing those Reports prior to United's decision. The remedy for that failure, according to plaintiff, is to allow her to supplement the record and allow me to review the following additional records: (1) Lyttle's August, 2016 application for Social Security Disability Benefits (SSDI), including statements from Lyttle and plaintiff about Lyttle's increasing daily life limitations as of January 2016; (2) the September 2016 award of SSDI benefits, concluding Lyttle was disabled as of January 5, 2016; and (3) additional medical records from the September 2015, March 2016, and August 2016 from Ilkcan Cokgor, M.D., prescribing additional pain medications and diagnosing neuropathy and vascular complications due to Lyttle's back issues and chemotherapy treatments.

Plaintiff's counsel argues he did not learn that Lyttle sought pain medications from Dr. Cokgor until January 2018. Counsel believes that Lyttle's omission of information about Cokgor from his initial disclosures (compiled in June 2017) was because Lyttle was in or approaching hospice care by the time he reviewed the initial disclosures. Supplemental Declaration of Robert J. Rosati (Dkt. No. 38-1) ¶ 11. At that time, Lyttle did not disclose and his counsel did not know that Lyttle had sought treatment from Cokgor, although Lyttle did disclose additional medical records from an April 2017 hospitalization. *Id.*, ¶¶ 2, 4. Lyttle's counsel did not discover the records from Cokgor until plaintiff remembered that Lyttle had sought treatment outside of Kaiser

12

in January 2018, after Lyttle's death and after the conclusion of the mediation in this case (which she attended).  *Id.* ¶ 11.

United opposes supplementing the Administrative Record with this new evidence, arguing that there is no basis to expand the Record in this case, that United has been prejudiced by Lyttle's failure to identify and then disclose the additional medical records in conjunction with his initial disclosures under Rule 26, and that the records are inadmissible hearsay and lack authentication.

## LEGAL STANDARD

Both parties agree that I should review of Omaha's decision de novo.  In conducting a de novo review of an ERISA plan's denial of benefits, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) (en banc); *see also Muniz v. Amec Const. Mgt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010) ("When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan.").  "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant."  *Muniz v. Amec Const. Mgt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

Under the de novo standard, a district court should determine whether the plaintiff is entitled to benefits based on the evidence in the administrative record, and evidence outside the administrative record may only be considered in "certain limited circumstances." *Opeta v. Nw. Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007). "[A] district court should exercise its discretion to consider evidence outside of the administrative record only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Id.* (emphasis in original; internal citation and quotations omitted).

In *Opeta*, the Ninth Circuit cited a non-exhaustive list of circumstances in which looking outside the administrative record may be necessary on de novo review: claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary

record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process. *Id.* (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993)).

## DISCUSSION

### I. REVIEW BASED ON ADMINISTRATIVE RECORD

United argues that because Lyttle did not see Dr. Kim or any other provider between November 10, 2015 and March 1, 2016 for his hand-foot syndrome and had no restrictions on his activities during that time due to any physical or mental condition, there is no basis for concluding that Lyttle was disabled by his pre-existing conditions at any time, much less "continuously disabled" during the Elimination Period and thereafter. It points out that there is no evidence in the record that Lyttle's hand-foot syndrome became significantly worse or that there was a sudden impairment in his intellectual functioning that necessitated his going on disability as of January 2016. Instead, it notes that in the month prior to going out on disability (November 2015), Dr. Kim characterized Lyttle's symptoms as having been stable for the past year and did not mention the presence of painful blisters. It was only on Dr. Kim's next examination, in May 2016, that Dr. Kim noted painful blisters; even then he did not "diagnose" Lyttle with hand-foot syndrome. *Compare* AR 669 *with* AR 225-27. Absent a change in circumstances, such as a significant worsening of his conditions, United argues that its determination that Lyttle was not totally disabled during the Elimination Period and after must be upheld.

United takes too narrow a view of the medical evidence in the Administrative Record. It never asked the determinative question under Lyttle's policy: could Lyttle perform his job with "reasonable continuity" at the end of 2015 when he went out on medical leave as continuously approved thereafter by his treating physician. United's claims reviewers, including Nurse Kerr and Dr. Oluwole, did not ask whether Lyttle was able to continue with his demanding job with "reasonable continuity" but only looked to whether there had been a change in Lyttle's symptoms

14

from late 2015 (when he was still working) to early 2016 (when he was off on medical leave as approved by Dr. Kim).[3]  There is also no evidence that United considered that Lyttle used significant amounts of vacation and sick time in 2015, and it failed to consider that Lyttle's failure to improve, as supported by the record, meant that he could not continue in his occupation given his continuous and existing pain.

### A.    Waiver

As an initial matter, plaintiff argues that United cannot rely in this proceeding on arguments that were not discussed or raised during the initial and appeal-level denials.  She relies on a line of authority explaining that because ERISA requires "full and fair" claims administration processes and requires that denials of benefits must be specific and detailed, insurers cannot "sandbag" claimants by withholding their reasons for denying benefits (either initially or on administration appeal) and those insurers waive their ability to argue new grounds for denial at the district court.  *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012).

As relevant here, plaintiff contends that United has waived and cannot argue that Lyttle is not entitled to benefits because: (i) there was no diagnosis or treatment of hand-food syndrome during the Elimination Period; (ii) there was no evidence of cognitive impairment during the Elimination Period; or (iii) that Lyttle's activities and abilities during the Elimination Period is relevant evidence that he was not totally disabled.  She argues that these reasons supporting United's denial were not raised by United in the administrative claims process.  Pl. Oppo. at 9-10. That is not correct.

United relied on information regarding Lyttle's activities as evidence that he was not disabled in its initial denial.  AR 251.  As to cognitive impairment, the appeal letter concluded there was insufficient evidence of cognitive impairments that would prevent Lyttle from working in his occupation.  AR 132.  That this reason was not couched, as it is in United's motion here, as a lack of evidence of cognitive impairment during the Elimination Period is not significant

---

[3] As United notes, the Policy defines "Usual Occupation" as the position Lyttle held – VP of Chemistry – but the "usual occupation" job definition was not "necessarily limited to the specific job" Lyttle performed.  However, there are no disputes as to the demanding nature, from a cognitive and physical perspective, of the job duties of a VP of Chemistry generally.

because no one disputes that the question being reviewed is whether Lyttle was disabled during the Elimination Period and thereafter.

As to United's argument in support of its motion that there was no "diagnosis" of hand-foot syndrome during the Elimination Period, plaintiff's position that this was not a reason articulated by United during its administrative process is more persuasive. But the bottom line for purposes of my de novo review in this case is whether there is sufficient evidence that Lyttle was not able to perform his own occupation with reasonable continuity during the Elimination Period because of his allegedly disabling conditions. The record shows that he had been diagnosed with hand-foot syndrome due to taking the Sorafenib to treat his liver cancer. In February 2016, Dr. Kim informed United that Lyttle's "primary diagnosis" was hand/foot syndrome. AR 1019. Not having seen Lyttle since November 2015, that diagnosis – which was consistent across Lyttle's records since Lyttle started Sorafenib in September 2014 – was necessarily based on Kim's long-term history of treating Lyttle. United argues that there is no evidence of painful and open blisters on Lyttle's feet since 2014 or during 2015, but that does not mean that Lyttle was not in significant or disabling pain due to the Sorafenib/hand-foot syndrome. United points to no evidence that Lyttle was *not* continuing to suffer from significant pain in his feet, the symptoms of hand-foot syndrome, during the Elimination Period. Therefore, that there was no new or separate diagnosis of hand-foot syndrome during the Elimination Period is not significant to my de novo review. The question I must address is whether Lyttle's pain, treatments for that pain, and limitations due to that pain caused him to be disabled under the Policy during the Elimination Period, regardless of whether this argument has been waived by United's failure to raise it in the claims process.

### B. Standard Applied by United – Changed Conditions Versus Ability to Continue With Reasonable Continuity

Plaintiff's main argument is that United failed to assess as of January 2016 whether Lyttle could perform or had been performing prior to that date his actual occupation with "reasonable continuity" in light of his pain and his use of Norco. She argues that Lyttle was essentially barely performing his job and could not continue his actual occupation with "reasonable continuity"

given the record and the subjective evidence from Lyttle that his pain conditions had become worse during 2015, that his employer could not provide further accommodations to him, and that he used extensive vacation and sick leave in 2015.

Lyttle relies on *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003). In that case, the Seventh Circuit held that an insurer could not rely uncritically on the fact that a person was working during the time his disabling conditions were allegedly present. As that court noted, "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling. . . . Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. Hawkins may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened. A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working." *Id.* at 918.

Here, while there is little direct, medical evidence in the Administrative Record of how much effort it took Lyttle to continue to work in 2015, there is significant subjective evidence gathered during the administrative claims process. That evidence includes Lyttle's interview with O'Grady and the explanations provided by Lyttle in his appeal letter. Both were consistent that Lyttle's pain and his use of Norco increased in 2015, and that by the end of 2015 it was untenable for him to continue in his work. AR 232-235.

United complains that this subjective evidence, particularly the rate and need for such high levels of Norco, is not supported by treatment notes from Lyttle's doctors documenting increasing pain, attempts to change treatment, or the presence of any cognitive impairments experienced at any point 2015. United notes that in November 2015, Dr. Kim indicates Lyttle was "stable," but an oncologist noting that Lyttle was "stable" does not necessarily indicate that his pain was being adequately managed for the long term (as opposed to, say, that his liver cancer was stable because of treatment with Sorafenib). United continued to ignore that Dr. Kim *did* put Lyttle off work on disability due to Lyttle's "feet pain" as of January 2016.

Plaintiff also points out that in 2015, Lyttle was absent from work 17% of the time, given

his use of 320 hours of vacation pay, 24 hours of sick time, and 8 hours of bereavement time. Pl. Oppo. at 13-14. There is no evidence that United considered Lyttle's time off in determining whether he could continue with his job with reasonable continuity. *C.f., Neaton v. Hartford Life and Acc. Ins. Co.*, 517 Fed. Appx. 475, 485 (6th Cir. 2013) (unpublished) (court concluded the insurer abused its discretion in denying benefits based on vocational expert's failure to accurately calculate the amount of time a claimant missed from work due to allegedly disabling conditions). I recognize that there is no evidence in the record that this time off in 2015 was *necessitated* by Lyttle's pain, increased use of Norco, or other symptoms from his cancer treatment, but significant time off work is relevant to whether a person can continue in his job with reasonably continuity.

Finally, plaintiff points out that when asked, Lyttle's employer was unequivocal that Lyttle's problem with his feet was only a symptom of his larger medical issue (cancer) and that Lyttle could not perform his job and could not be accommodated. AR 299.

United relies heavily on evidence that during this Elimination Period in early 2016, Lyttle and his wife were taking care or assisting in some manner Lyttle's in-laws and Lyttle's father, travelling frequently between Marin, Sonoma, and Madera counties, supervising the remodel of their Sonoma home, and that Lyttle continued to handle his finances and significant investments on his own. That he *and his wife* were in some capacity assisting their parents and that he continued to do small home improvement tasks and manage his investments (to some unknown capacity) does not mean that he could perform the demanding functions of a VP of Chemistry with reasonable continuity.

Finally, O'Grady's opinion also supports a finding that Lyttle could not continue with the demands of his job as of the Elimination Period if Lyttle was – as Lyttle claimed and as Dr. Kim believed – taking Norco up to five time a day. O'Grady agreed that Lyttle showed cognitive impairment that could prevent him from performing his regular occupation, ascribing those impairments not to organic disease processes but to Lyttle's use of opioid pain medications. AR 147. United argues that O'Grady made that assessment only as of November 2017 and, therefore, it is irrelevant to Lyttle's cognitive functioning during the Elimination Period. However, the testimony from Lyttle as supported by Dr. Kim is materially consistent--during the relevant time

1   Lyttle was on a very high level of Norco which could (and according to O'Grady, did) impair his

2   cognitive functioning.

3        United did not adequately consider Lyttle's use of Norco in denying him benefits.

4        **C.      Complaints of Disabling Pain and Fatigue**

5        In addition, plaintiff claims that United did not take into adequate account Lyttle's

6   subjective claims of disabling pain.  Those statements include (as reported to Dr. Kim) that as of

7   May 2016, Lyttle was taking 5 Norco pills a day to accommodate his pain, that walking and

8   standing exacerbated that pain, and (as stated in his appeal letter) that his pain was getting worse

9   and harder to tolerate.  This subjective evidence is supported by the fact that that Dr. Kim placed

10  Lyttle off work starting at the end of December and again in 2016 *because of* Lyttle's foot pain.

11  *See also* AR 615 (medical treatment notes documenting "chronic pain").

12       In sum, United asked its reviewers and examiners the wrong question and did not ask them

13  to evaluate whether as of the end of December 2015 Lyttle was able to continue in his high-

14  demands job with "reasonable continuity."  It failed to analyze both the significant subjective

15  evidence of pain and cognitive impairments, given Lyttle's consistent testimony as to Norco use.

16  It also failed to consider that Lyttle was only able to continue in his job as long as he did with the

17  pain level he had through using leave time and, in the end, was not able to continue given his

18  chronic, ongoing pain despite the lack of evidence of a "significant change" in condition that

19  United (erroneously) sought.

20       On de novo review, I GRANT plaintiff's motion for summary judgment and find he was

21  entitled to LTD benefits under United's Policy and DENY United's cross-motion.  Given this

22  outcome, I need not look to the "additional evidence" plaintiff claims she is entitled to rely on in

23  support of her motion.  If, however, this evidence was admissible, it too would strongly support a

24  determination that Lyttle was not able to perform his job given the amount of pain medication he

25  was using to manage the pain caused by his hand foot syndrome.

26  **II.    ADDITIONAL EVIDENCE**

27       Plaintiff argues that United did not provide a "full and fair" review of Lyttle's claim as

28  required by ERISA because it failed to provide Lyttle with copies of Dr. O'Grady's and Dr.

Oluwole's medical Reports prior to denying Lyttle's appeal on December 21, 2016, and that those failures allow her to expand the record with the additional information under *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006). She contends that the remedy for United's failure to provide a full and fair review process is to allow her to add to the record: (1) Lyttle's August 2016 Social Security Disability Benefit (SSI) application; (2) the SSI award of benefits, finding Lyttle disabled as of January 5, 2016; and (3) additional medical records from Dr. Cokgor for pain management due to neuropathy related to his back and chemotherapy treatment from September 2015 through August 2016. Declaration of Robert J. Rosati (Dkt. No. 33-1), at Exs. 1- 3.[4]

I have previously considered and rejected plaintiff's argument in *Montoya v. Reliance Stand. Life Ins. Co.*, 14-CV-02740-WHO, 2015 WL 1056560, at *5 (N.D. Cal. Mar. 10, 2015). There I held, following *Abatie*, that an insurer does not have a duty under ERISA's "full and fair" processes requirements to disclose IME reports to claimants prior to making their decisions *unless* the insurer relies on the un-shared IME report to find a new reason to deny coverage. In that "sandbagging" scenario, I concluded that an insurer may violate ERISA by failing to disclose the IME reports prior to reaching a final conclusion on benefits. *Id*. at *5.

In this case, plaintiff has not identified any "sandbagging" by United. The opinions of Oluwole were consistent with the reasons United made its initial denial. While the opinions of O'Grady regarding cognitive impairment were not mentioned in United's initial decision, they were secured by United only after Lyttle filed his appeal because Lyttle raised the issue of cognitive impairments for the first time in August 2016, after United's initial denial.

As noted above, I need not consider this additional, extra-Administrative Record evidence because I have granted plaintiff's motion based on a de novo review of the decisions and evidence in the Administrative Record. But if I agreed with her arguments and I considered the extra evidence, it would support my determination above. Plaintiff's and Lyttle's subjective statements

---

[4] Plaintiff also argues that consideration of this extra-record evidence is permissible in this de novo review case because of the "complex medical questions or issues regarding the credibility of medical experts." *Opeta v. Nw. Airlines Pension Plan*, 484 F.3d at 1217 (relying on *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir.1995)). However, neither side is attacking the credibility of the medical experts in this case. Nor is there any debate over particularly complex medical evidence.

in support of Lyttle's SSDI application, the ultimate award of SSDI to Lyttle, and the pain management and medication records from Cokgor, all support the determination that at of the end of December 2015, Lyttle's pain was significant, required or resulted in his taking high levels of pain medication, and his physical and cognitive abilities precluded him from working in his own occupation with reasonable continuity during the Elimination Period and thereafter.[5]

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED and United's motion is DENIED.

**IT IS SO ORDERED.**

Dated: September 19, 2018



William H. Orrick
United States District Judge

---

[5] United argues that even if there were grounds to allow me to review these records, I should not because the medical records, particularly Lyttle's SSDI applications with statements regarding his pain and limitations, are inadmissible hearsay and the Cokgor records were not disclosed in Lyttle's Rule 26 initial disclosures to the prejudice of United. The hearsay objection is not well taken in this type of case. *See Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 978 (9th Cir. 1999) (evidence "need not satisfy the strict rules for the admissibility of evidence in a civil trial, and may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability."). As to the Cokgor records, plaintiff and plaintiff's counsel have explained why this evidence was belatedly disclosed. There is no evidence that plaintiff attempted to sandbag United or otherwise acted in bad faith.